UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICARDO MALLOY,

        Plaintiff,

    v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY and
AMALGAMATED TRANSIT UNION
LOCAL 689,

        Defendants.

Civil Action No. 15-1499 (RDM)

**MEMORANDUM OPINION AND ORDER**

Ricardo Malloy, proceeding *pro se*, brings this suit against his former employer, Washington Metropolitan Area Transit Authority ("WMATA"), and his former union, Amalgamated Transit Union Local 689 ("Union"). The complaint includes allegations of conspiracy, treason, slavery, and numerology, but at its core it alleges a dispute over Malloy's termination from WMATA and the alleged failure of his union to represent him adequately during that process. Both WMATA and the Union have moved to dismiss. As explained below, the Court concludes that Malloy's most substantial claims are barred by the statute of limitations and that his remaining claims are unsupported by plausible, factual allegations. The Court will, accordingly, **GRANT** the Defendants' motions and dismiss the complaint.

**I. BACKGROUND**

For purposes of resolving Defendants' motions to dismiss, the Court accepts the following allegations contained in the complaint as true.[1] *See, e.g.*, *Hishon v. King & Spalding*,

---

[1] All citations to the complaint are to the amended complaint found at Dkt. 3.

467 U.S. 69, 73 (1984). Malloy was employed by WMATA as a train operator for fifteen years. Compl. ¶ 1. On January 5, 2013, he was operating a train that closed its doors on the arm of one of Malloy's supervisors, Rachael Corbie. *Id.* ¶ 26. According to a report Corbie filed, which Malloy quotes in his complaint, Corbie immediately contacted Malloy on the train's emergency intercom, identified herself, asked that Malloy identify himself, and asked if Malloy "realized that he held [Corbie] in the door?" *Id.* ¶ 27. The incident rapidly degenerated into a verbal and physical confrontation. Rather than respond to his supervisor's question, Malloy asked Corbie whether she had heard the "chimes," indicating that the doors were about to close. *Id.* When Corbie indicated that she was not given ample time to avoid the doors, Malloy "cut [her] off," and once again asked, "did you or did you not hear the door chimes!" *Id.* Corbie then informed Malloy that she was taking him "out of service," and, at the next stop, she walked down the platform and entered the "operating cab." *Id.* ¶ 28. As Malloy was leaving the cab, Corbie instructed him not to leave. *Id.* Disregarding Corbie, Malloy left the cab, "bumping the right side of [Corbie's] body," and told Corbie that he was "out of service" and that she should operate the train. *Id.* After the train arrived at the Greenbelt Terminal, Malloy once again approached Corbie and again asked whether she "did not hear the door announcement." *Id.* ¶ 29. Corbie asked Mallory "to leave [her] alone." *Id.* The transit police were summoned and took statements from both Malloy and Corbie. *Id.* ¶ 30.

     Six days after this incident, WMATA superintendent Edwin Harris emailed Lisa Cooper-Lucas, who was apparently the point of contact for WMATA's Employee Assistance Program, and asked how he "could get [Malloy] . . . some type of (mental) fitness for duty evaluation." Compl. ¶ 43. Harris described Malloy as "an employee who has been displaying some very erratic and irrational behavior" and recounted two incidents in the recent past. *Id.* ¶ 42. One was

the episode with Corbie; the other occurred several weeks earlier when Malloy was also "taken out of service," this time for "operating his train with a safety switch unsealed." *Id.* ¶ 42. The email further explained that following the incident involving the safety switch, Malloy became irate and began "screaming in the hallway and the office of [Harris's] assistant and demanded a letter" addressing certain problems with Metro. *Id*. Harris added that "[t]hese are just two in a string of incidents with [Malloy] and each time there is [an] event, he always writes long reports describing a conspiracy theory that the Authority/Union is out to get him." *Id.* ¶ 43. Finally, Harris wrote that he did not believe that Malloy could "operate a train safely." *Id.*

Although the complaint does not recount Cooper-Lucas's response, Harris told Malloy to report to the Employee Assistance Program for a medical exam on January 15, 2013. Compl. ¶ 44. When Malloy asked why this was necessary, Harris allegedly stated that he was "not going to argue with" Malloy and that "because of his relationship with the Freemasons," neither "the arbitrator[] nor the public would hear of [Malloy's] grievance." *Id.* ¶ 44. Malloy then contacted a union officer and explained that he had been instructed to undergo a medical examination and that Harris had refused to provide any reason for this direction. *Id.* ¶ 45. In response, the union officer allegedly told Malloy that Harris could indeed require him to undergo a medical exam without offering an explanation. *Id.* Malloy then signed a form acknowledging that he had to submit to the exam but wrote on the form that he did "not understand the purpose or the goal of this examination," but he was complying because he had "been instructed to make the appointment o[r] lose [his] position as a train operator." *Id.*

Malloy arrived for his evaluation the next day and began by filling out a questionnaire. Compl. ¶ 48. At that point, he alleges, "Dr. Thomas, whom [Malloy] had never met, led [him] to her office wearing an inappropriately tight, fuchsia, or light purple dress." *Id.* Malloy then

began to record their conversation with a mini-recorder. *Id.* The contents of that recording are not part of the record. Malloy alleges that Dr. Thomas explained that he had been referred to her for evaluation because of his aggressive behavior during the two incidents mentioned in Harris's email. *Id.* Malloy alleges that he "answered all of Dr. Thomas's questions" and provided "full explanations." *Id.*

According to the complaint, WMATA extensively investigated the incident involving Corbie. Corbie and others submitted reports to WMATA, as did the transit police. Compl. ¶¶ 37–40, 58. Following this investigation, Malloy received a letter from Harris recounting WMATA's findings and its conclusion that Malloy was "disrespectful, rude and threatening" in his encounter with Corbie. *Id.* ¶ 58. Based on this "deplorable" conduct, Malloy was suspended for 22 days without pay and was directed "to attend a Workplace Violence class and anger Management counseling." *Id.* Malloy was further informed that "[a]ny future serious operational violations of the rules or policy will result in your immediate termination from WMATA." *Id.* ¶ 59.

Malloy filed a grievance regarding this suspension on February 22, 2013.[2] Compl. ¶ 66. The following day, he received a letter from Dr. Thomas explaining that she was recommending that he "seek treatment with a licensed psychologist, therapist, and/or psychiatrist" due to the "significant concerns" she had regarding "the escalation of [Malloy's] aggressive behaviors at work." *Id.* ¶ 67. The letter further informed Malloy that he would remain on medical leave "during this phase of [his] treatment" and that he would not be allowed to return to work until (1) Dr. Thomas was provided with a letter from Malloy's "treatment provider(s)" detailing his

---

[2] Malloy had earlier filed a grievance on January 14, 2013, *see* Compl. ¶ 46, but had to re-file it for technical reasons, *id.* ¶ 65. That procedural issue is irrelevant to the result in this case.

4

"diagnosis, . . . treatment, prognosis [and] any [appropriate work] limitations and/or medication regimens," and (2) Dr. Thomas approved his return to work. *Id.* ¶¶ 68–69. Malloy was permitted to use his "paid time off" during this period, and was informed that other options, including short-term disability, might be available after Malloy exhausted his paid time off. *Id.* ¶ 69.

Over the next several months, there was a constant back-and-forth among Malloy, the Union, and WMATA concerning his grievances and various other issues. *See, e.g.*, Compl. ¶¶ 70–154. In the meantime, WMATA sent Malloy a letter on June 10, 2013, reminding him that he would remain on medical leave while he obtained the treatment that Dr. Thomas recommended and that he was required to submit a letter from his "treatment provider(s)" describing his "diagnosis, . . . treatment, and prognosis" before he could return to work. *Id.* ¶¶ 167–68. WMATA then wrote to Malloy again on September 5, 2013, noting that he had yet "to provide the requested information" and that, if he failed to do so by September 16, 2013, WMATA would "begin administrative action to discharge" him. *Id.* ¶168–69. Although Malloy did provide some documents to the WMATA medical office, WMATA concluded that those documents failed to comply with the request contained in Dr. Thomas's letter. *Id.* ¶ 169. WMATA, accordingly, concluded that Malloy had failed to timely provide the requested medical information and fired him on that basis on September 19, 2013. *Id.* ¶¶ 170–71.

Malloy filed a grievance on October 4, 2013, contesting his termination. Compl. ¶ 177. After WMATA denied that grievance, the Union agreed to arbitrate it on his behalf. *Id.* ¶ 265. The Union hired Douglas Taylor of Gromfine, Taylor, and Tyler, P.C., to represent it (and thus to advance Malloy's interests) in the arbitration proceeding. *Id.* ¶¶ 276, 279. Dr. Thomas was the lone witness at the November 19, 2014, arbitration hearing. *Id.* ¶ 280. She testified about

5

her evaluation of Malloy and that she never received the verification of treatment she had directed he undergo. *Id.* She also appears to have offered a diagnosis of Malloy, *id.* ¶¶ 280, 284, although the complaint does not specify that diagnosis.[3] At some point, it appears that Malloy revealed that he had recorded the session with Dr. Thomas and asserted that the recording would prove that her testimony was false. *Id.* ¶¶ 281, 283–84. It also appears—although the complaint is vague on this point—that the arbitration proceeding was scheduled to continue on a future day so that Malloy could produce the recording. *Id.* ¶ 284, 286–88.

Taylor emailed Malloy on December 10, 2014, to go over the status of the arbitration proceeding. Compl. ¶ 284. He explained that Malloy's case came down to attacking Dr. Thomas's diagnosis, which Malloy alleged was based on false reports about his work and a false account of what happened at his medical evaluation. *Id.* Taylor continued that the Union "need[ed] to use [Malloy's recording] to prevail" in the proceeding and that the arbitrator was prepared to exclude the recording altogether because the Union had still not produced it despite an apparent promise to do so. *Id.* As a result, Taylor instructed Malloy that he "must produce a copy of the tape" before the second arbitration hearing and that if he did not, Taylor would "conclude that [he was] not cooperating" and would "recommend that the Union cease arbitrat[ing] [the] case." *Id.* ¶ 286.

Based on what appears to be a transcript that Malloy personally prepared of the second arbitration hearing and attached to his opposition to the motions to dismiss, Malloy argued at the second session of the hearing that the tape was unnecessary because he was not fired based on his diagnosis but based on his failure to provide the necessary paperwork to Dr. Thomas. *See*

---

[3] The complaint elsewhere suggests that at some unnamed time Dr. Thomas had diagnosed Malloy with Intermittent Explosive Disorder. *Id.* ¶ 98.

6

Dkt. 15 at 21–24.  That hearing concluded with Malloy refusing to produce the tape and Taylor stating he would have to consult with the Union about how to proceed.  *Id.* at 23–24.  A couple of weeks later, Malloy emailed Taylor to ask if the Union had dropped his grievance from arbitration.  Compl. ¶ 289.  Taylor responded that his "advice to the local and their direction to me are confidential, privileged communications," that he understood that Malloy was no longer a "qualified" member of the Union, and that his grievance had been dropped.  *Id.* ¶ 290.  In light of Malloy's stated intention to sue the Union, Taylor also explained that his communications with Malloy were now "adversarial" and that he "must preserve the intents and confidentiality of [his] client."  *Id.*

Malloy then sued WMATA and Local 689.  At the time he originally attempted to file suit, Malloy sought leave to proceed without paying the filing fee—known as proceeding *in forma pauperis*.  *See* Case No. 15-mc-1112, Dkt. 1-1.  That application, which was dated July 19, 2015, *id.* at 2, was denied by Judge Jackson on August 21, 2015.  *See* Case No. 15-mc-1112, Dkt. 1.  Malloy paid the filing fee on September 15, 2015, and his original complaint was docketed at that time.  *See id.*  After the Union moved to dismiss, *see* Dkt. 2 (Case No. 15-cv-1499), Malloy filed an amended complaint, *see* Dkt. 3.  WMATA filed a motion to dismiss two days later, *see* Dkt. 6, but that motion was in response to the original complaint, which had been superseded by that time.  Both WMATA and the Union have now moved to dismiss the amended complaint.  *See* Dkts. 8, 9.

Malloy's complaint is 79 pages and 301 paragraphs long.  It contains multiple accounts of the incidents in this case, including what appears to be language taken verbatim from various documents submitted as part of the grievance and arbitration processes.  Many of the allegations in the complaint, for example, use the first person but are from the perspective of someone other

than Malloy.  The complaint also contains a great deal of material that does not bear a clear connection to Malloy's suspension, termination, or grievance, including references to numerology, the Masons, the Illuminati, conspiracies, treason, and slavery.  Compl. ¶¶ 24–25.

Omitting repetition, the complaint asserts ten counts.  The first is against WMATA for breach of the collective bargaining agreement between the Union and WMATA.  Compl. at 75.[4]  The second is against Local 689 for breach of the duty of fair representation, taking issue with how the Union represented him in the arbitration process.  *Id.*  These same claims are then repeated as counts eight and nine, respectively.  *Id.* at 76.  Other counts allege "police misconduct," wire and mail fraud, due process violations, intentional infliction of emotional distress, defamation, and mental health malpractice.  *Id.* at 75–77.

Before the Court now are Defendants' motions to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).  Malloy responded to those motions with a "motion to deny" them, Dkt. 15, which the Court will construe as his opposition.  He has also filed a motion to disqualify the Union as opposing counsel.  *See* Dkt. 13.

## II.  STANDARD OF REVIEW

A party moving to dismiss a complaint under Rule 12(b)(6) bears the burden of showing that the complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6); *see also Cohen v. Bd. of Trs. of Univ. of D.C.*, No. 15-7005, slip op. at 7 (D.C. Cir. Apr. 22, 2016).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial

---

[4]  The amended complaint contains two pages with the number "75" at the bottom.  The Court will refer to the page that corresponds with the actual number of pages in the document, so that it will refer to the second page labeled as "75" as page 76, the page labeled as "76" as page 77, and so on.  This affects only a handful of pages, as the amended complaint is 79 pages long.

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007) (citation omitted)). The Court need not accept as true any legal conclusions disguised as factual allegations, "'naked assertions' devoid of 'further factual development,'" or a "'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). The plaintiff, however, is entitled to "the benefit of all inferences that can be derived from the facts alleged." *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

### III.  DISCUSSION

**A.    Breach of Collective Bargaining Agreement and Duty of Fair Representation Claims**

Malloy's first two claims are closely related. The first count alleges that WMATA breached the collective bargaining agreement it had with the Union by suspending and eventually firing him "without cause," and the second count alleges that the Union breached its duty of fair representation stemming from the arbitration process. Compl. at 75–76.

The Supreme Court addressed claims of this type in *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151 (1983). There, the Court explained that in the ordinary course a union member who wants to sue his union or his employer must exhaust "any grievance or arbitration remedies provided in the collective bargaining agreement." *Id.* at 163. The employee is then typically "bound by the result according to the finality provisions of the agreement" and entitled to only "very limited" judicial review. *Id.* at 164. Review is available, however, "when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *Id.* In those circumstances, the employee "may bring suit against both the

employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *Id.* Claims of this type, which are known as a "hybrid § 301/fair representation claims," thus involve two distinct causes of action—one against the employer under § 301 of the Labor Management Relations Act, the other against the union for breach of the duty of fair representation, which is implied under the National Labor Relations Act. *Id.* But "the two [claims] are inextricably related," because "to prevail against either" defendant, the employee "must not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union." *Id.* at 165 (internal quotation marks omitted).

In addition to describing the requirements for alleging hybrid claims, like those alleged here, *DelCostello* also addressed the statute of limitations applicable to such claims. While stressing that it was not abandoning its "prior practice [of] borrowing limitations periods for federal causes of action" from analogous state-law provisions, the Court concluded that the six-month statute of limitations "for making charges of unfair labor practices to the NLRB" provided "a closer analogy than available in state statutes." *Id.* at 169, 171–72. The Court, accordingly, adopted from the National Labor Relations Act a six-month statute of limitations for hybrid § 301/fair representation claims. *Id.* at 172. It is thus clear that Malloy had six months to bring a suit on his hybrid claims.

What is less clear is when that clock began to run. Had Malloy received a final determination from the arbitrator, his time to bring suit would have run from that adverse decision. *See DelCostello*, 462 U.S. at 172. Here, however, his grievance never made it that far because the Union concluded that it could not proceed without the tape recording of Dr. Thomas's evaluation, which Malloy declined to provide. Like an adverse decision, the Union's

decision to drop Malloy's grievance effectively ended his bid for administrative relief and triggered the time to bring suit. The relevant question, then, is when Malloy "knew or should have known," *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 930 n.29 (D.C. Cir. 2013), that his grievance had been withdrawn.

According to the Union, the grievance was withdrawn on January 6, 2015. *See* Dkt. 2-1 at 3. The complaint, however, alleges that Malloy was not informed of this fact until January 20, 2015, when he emailed Taylor to ask whether the Union had made a decision whether to "pull" the grievance, and Taylor responded that the grievance "has been dropped." Compl. ¶¶ 289–90. Taking the allegations of the complaint as true, and assuming that Malloy's original complaint was filed on the day that it is dated, *see Malloy v. WMATA*, 15-mc-1112 (complaint dated July 19, 2015), Malloy would have met the statute of limitations—if only by a day. The problem he faces, however, is that his original complaint was not filed because, in lieu of paying the filing fee, he moved to proceed *in forma pauperis*, and that motion was denied on the ground that he earned in excess of $41,000 a year and reported no debt or inordinate expenses. *See id.* at Dkt. 1. Although the Court did not deny Malloy's *in forma pauperis* motion until August 21, 2015, moreover, Malloy then waited until September 15, 2015, to refile his complaint with the required fee. By that time, he was well beyond the six-month statute of limitations.

This does not end the inquiry, however, because the statute of limitations does not pose a jurisdictional hurdle, and it is thus subject to equitable doctrines, including tolling. *See Norman v. United States*, 467 F.3d 773, 775 (D.C. Cir. 2006); *see also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 395 n.11 (1982); *cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006) (holding that a statute is not jurisdictional unless the "Legislature clearly states" so). The lone equitable consideration that Malloy raises is a contention that the Union never gave him "actual

notice of the status of his grievance." Dkt. 15 at 5.  But Malloy's complaint alleges that Taylor emailed him on January 20, 2015, and told him, among other things, that his "grievance has been dropped."  Compl. ¶ 290.  The Union has also provided a copy of this email, *see* Dkt. 2-5, which the Court may consider because Malloy's complaint incorporated it by reference, *see EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  As a result, the Court cannot credit Malloy's argument that he did not receive notice of the withdrawal of his grievance and must conclude that he "either knew or should have known," *Emory*, 720 F.3d at 930 n.29, that the time to file his claim began no later than January 20, 2015.

Although Malloy has not asserted any other basis for seeking to toll the statute of limitations, *see* Dkt. 15, the Court deems it appropriate—particularly in light of Malloy's *pro se* status—to consider how his initial efforts to file a timely complaint bear on the statute of limitations defense.  In particular, courts often toll statutes of limitations during the period of time an application for leave to proceed *in forma pauperis* is pending.  *See, e.g.*, *Johnson v. Interstate Mgmt. Co.*, 871 F. Supp. 2d 1, 4 (D.D.C. 2012); *Kone v. District of Columbia,* 808 F. Supp. 2d 80, 83 (D.D.C. 2011).  Some decisions, moreover, go a step further and accord applicants an additional grace period to ensure that they have received actual notice of the denial of their applications.  As Chief Judge Howell explained in *Nkengfack v. Am. Ass'n of Retired Persons*, 818 F. Supp. 2d 178, 182 (D.D.C. 2011), "the weight of authority supports tolling the statute of limitations not only for the pendency of an [*in forma pauperis*] application, but also for a reasonable period thereafter to account for receipt of notice of the court's decision."  *Id.* at 183.  Based on that precedent and on notions of "basic fairness," Chief Judge Howell concluded that the statute of limitations at issue in that case should be tolled for "an additional five-day

presumptive notice period to account for notice of the Court's ruling on the plaintiff's [*in forma pauperis*] application." *Id.* at 184.

Even granting Malloy all of these allowances, his complaint is still untimely. At best, he filed his *in forma pauperis* application with just one day left on the statute of limitations. After the Court denied that application, another twenty-five days passed before Malloy actually filed his complaint with the required fee. Because Malloy has failed to offer any justification for this significant delay—which was far longer than necessary to ensure that he received notice of the Court's denial of his *in forma pauperis* application—and because the Court can discern none, Defendants' motions to dismiss Malloy's claims for breach of the collective bargaining agreement and the duty of fair representation are **GRANTED**.

**B.      Remaining Claims**

The remaining claims in Malloy's complaint fail as well. He alleges claims for "police misconduct," wire fraud, mail fraud, extortion and violations of his right to due process. *See* Compl. at 75. As an initial matter, the Court notes that it is unclear whether these claims were included by error. The first four of these claims include no substantive allegations but merely cross-reference other allegations in the complaint, none of which bears a discernible relationship to the alleged torts. *Id.* And the last of these claims is followed by allegations, including a fragment of a sentence, that have nothing to do with due process and appear to have been misplaced under that count. *Id.* at 75–76. In addition, after reciting these claims, the complaint repeats the first two counts and labels the last five counts as counts "one" to "five." *Id.* at 76. But even assuming that Malloy intends to allege claims for police misconduct, wire and mail fraud, extortion, and violations of his right to due process, the complaint fails "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Stripped of "labels and

conclusions," each of these counts lacks any factual allegations that would permit "the [C]ourt to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To the contrary, the Court cannot even discern the legal theory upon which Malloy seeks to proceed with respect to these claims.

Malloy also alleges claims against WMATA for intentional infliction of emotional distress, defamation and mental health malpractice. Compl. at 76–77. In response, WMATA argues that it is immune from suit under Section 80 of the WMATA Compact. *See* Dkt. 9 at 10. The Court agrees.

When Maryland, Virginia, and the District of Columbia signed the WMATA Compact, they "conferred upon WMATA their respective sovereign immunities." *Beebe v. WMATA*, 129 F.3d 1283, 1288 (D.C. Cir. 1997). Section 80 of the Compact, in turn, "waives this immunity for torts 'committed in the conduct of any proprietary function,' while retaining immunity for torts committed by [WMATA's] agents 'in the performance of a governmental function.'" *Id.* (quoting D.C. Code Ann. § 9-1107.01(80)). "The D.C. Circuit has held that the question [of] whether [a particular] function in question is governmental or proprietary under Section 80 is one of federal law, and has developed two alternative tests for identifying governmental functions under the WMATA Compact." *Turner v. WMATA*, 701 F. Supp. 2d 61, 67–68 (D.D.C. 2010) (internal quotation marks and citations omitted) (first alteration in original). Under this approach, the Court first considers "whether the activity amounts to a quintessential governmental function, like law enforcement," and, if not, the Court must go on to consider whether the activity is "discretionary," and thus "shielded by sovereign immunity," or "ministerial," and thus subject to the waiver set forth in Compact. *Beebe*, 129 F.3d at 1287 (internal quotation marks omitted). Of particular relevance here, the D.C. Circuit has also held

14

that "decisions concerning the hiring, training, and supervising of WMATA employees are discretionary in nature, and thus immune from judicial review." *Burkhart v. WMATA*, 112 F.3d 1207, 1217 (D.C. Cir. 1997); *see also Jones v. WMATA*, 205 F.3d 428, 432 (D.C. Cir. 2000)

Applying this standard, the Court concludes that WMATA's actions in suspending and removing Malloy from his position, and then defending that position in arbitration, are immune for suit in tort. The Compact grants WMATA the power to "provide for the qualification, appointment, [and] removal . . . of its . . . employees" and to "[e]stablish, in its discretion, a personnel system based on merit and fitness." D.C. Code § 9-1107.01(g), (h). Taking the allegations of the complaint as true, that is just what WMATA did here. Malloy may disagree with the decisions that were reached, but the complaint includes no basis to doubt that WMATA was exercising its discretion to set the qualifications for operating a train and to remove an employee who purportedly lacked the necessary qualifications. Indeed, more than most employment decisions, the actions alleged in the complaint bear the hallmarks of governmental action to the extent they were focused on protecting the safety of the public. WMATA is thus immune from the tort claims Malloy alleges.

While Malloy does not allege that the Union is liable for defamation or mental health malpractice, he does assert his intentional infliction of emotional distress against it. Compl. at 76. This claim, however, fails to allege a claim upon which relief may be granted under Rule 12(b)(6).[5] Malloy alleges that the "damages" that he suffered as a result of these alleged torts stemmed from a conspiracy between WMATA and the Union "to commit treason, the death

---

[5] Even if WMATA were not immune from suit, the Court would similarly dismiss Malloy's tort claims against WMATA because they fail under Rule 12(b)(6). As with his claim for intentional infliction of emotional distress against the Union, his claims for that tort and for mental health malpractice and for defamation against WMATA are not facially plausible. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

embedded in the email, and encoding the numbers 666 in the date of his termination." *Id.*  This claim plainly fails to satisfy the requirement established in *Twombly* and *Iqbal* that a plaintiff plead "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Finally, to the extent that Malloy alleges both in his complaint and in his opposition that Defendants have committed multiple criminal acts for which they should be held liable, *see* Compl. at 75; Dkt. 15 at 8, those allegations are not properly before the Court.  As the Supreme Court has explained, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).  Malloy thus lacks standing to press criminal charges here, *see id.*, and this Court lacks Article III jurisdiction over those claims as a result.

Defendants' motions are therefore **GRANTED** and the complaint is **DISMISSED.**

C. **Other Outstanding Issues**

Malloy has also filed a motion "to disqualify the Amalgamated Transit Union Local 689 as opposing counsel."  *See* Dkt. 13.  The entirety of the motion consists of a single sentence merely asserting that the basis for the motion is "set forth in the accompanying memorandums," which presumably refers to Malloy's opposition to the motions to dismiss, *see* Dkt. 15.  Nothing in any document Malloy has submitted explains why the Union (or its attorney) should be disqualified.  *Cf. Ethical Issues in Representing Multiple Plaintiffs or Defendants: Special Issues for Union Counsel*, American Bar Association 15–17 (Aug. 9, 2005), http://apps.americanbar.org/labor/lel-aba-annual/papers/2005/039.pdf (explaining that attorneys who represent a union during a member's arbitration grievance are not typically disqualified from representing the

union if the grievant sues for breach of the duty of fair representation, and collecting cases).  The motion to disqualify is, accordingly, **DENIED**.

### IV.  CONCLUSION

For the reasons explained above, the Defendants' motions to dismiss the amended complaint, Dkts. 8, 9, are **GRANTED** and the complaint is **DISMISSED**.  Because Defendants' earlier-filed motions to dismiss addressed the superseded complaint, *see* Dkts. 2, 6, those motions are **DENIED** as moot.  Malloy's motion to disqualify opposing counsel, Dkt. 13, is **DENIED**.  His motion to deny the motions to dismiss is **DENIED**.  A separate order will issue.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 20, 2016